RENDERED: JUNE 17, 2021
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2020-SC-0011-MR

JEWISH HOSPITAL, AN ASSUMED NAME                    APPELLANTS
OF JEWISH HOSPITAL & ST. MARY'S
HEALTHCARE, INC.; AND KENTUCKYONE
HEALTH, INC.


                    ON REVIEW FROM COURT OF APPEALS
V.                  CASE NO. 2019-CA-1306-MR
            JEFFERSON CIRCUIT COURT NO. 17-CI-00253


HONORABLE MITCH PERRY                                APPELLEE
JEFFERSON CIRCUIT COURT JUDGE

AND
                                        REAL PARTIES IN INTEREST

KAREN L. REDDINGTON, PARTY IN
INTEREST, INDIVIDUALLY, AND AS
EXECUTRIX OF THE ESTATE OF
DONALD PATRICK REDDINGTON SR.


### OPINION OF THE COURT BY JUSTICE LAMBERT

### REVERSING AND VACATING

Appellant, Jewish Hospital ("Hospital"), petitioned the Court of Appeals

for a writ prohibiting the Jefferson Circuit Court from enforcing its order

allowing the use of a root-cause analysis report ("RCA") at trial for

impeachment purposes. The Court of Appeals denied the petition, and Jewish

Hospital appeals from that denial. The issue before us is whether KRS[1] 311.377, as amended, protects the RCA from admission at trial. We now hold that the document is privileged, vacate the Circuit Court's order, and remand the case for further proceedings.

## I. BACKGROUND

Donald Patrick Reddington Sr. underwent surgery for a torn labrum in May 2016. Though surgery was successful, Mr. Reddington suffered post-surgical complications upon being extubated. As a result of his difficulty breathing, Mr. Reddington was admitted to the ICU. Over the next several days, he showed improvement and was transferred from the ICU to less intensive care. Shortly after his transfer, Mr. Reddington pulled out his tracheostomy tube and arrested. Despite CPR being administered, Mr. Reddington passed away eight days later.

His wife, Karen Reddington, individually and on behalf his estate ("Estate"), sued the Hospital alleging medical negligence. During discovery, the Estate sought production of any "incident report, sentinel event report, root cause analysis, or peer review" prepared in the aftermath of Mr. Reddington's death. The Hospital produced multiple documents, including the RCA, subject to the terms of an agreed protective order.[2]

---

[1] Kentucky Revised Statutes.

[2] The Agreed Protective Order required that all parties treat the RCA confidentially. Pursuant to the order, the RCA must only be used for the litigation and, within 60 days of the conclusion of the litigation, the RCA must be destroyed or returned to Jewish Hospital.

2

Subsequent to the RCA's production, the General Assembly amended KRS 311.377. As is relevant here, the amendment clarified that the evidentiary privilege created by the statute applied in "any civil action . . . including but not limited to medical malpractice actions[.]"[3] The Hospital filed a motion in limine to exclude the RCA from admission at trial, arguing that KRS 311.377(2) rendered the RCA privileged. The trial court denied the motion in limine, ordering that the RCA could be used at trial "for the purpose of impeachment."

The Hospital then filed an original action in the Court of Appeals seeking a writ of prohibition. The Court of Appeals denied the Hospital's petition. While the appellate court agreed with the Hospital that a writ would be warranted if the privilege applied, it disagreed that the statute protected the RCA. It held that the Hospital was not "performing a designated professional review function when it prepared the RCA."[4] The court focused on the impetus of the review process. It reasoned that the Hospital prepared the document for a business purpose, namely internal risk management, because the review process began after it became clear that litigation was imminent.[5] And it held that the business purpose of the RCA precluded the report from being privileged because internal risk management was not a professional review function.[6]

---

[3] KRS 311.377(2).

[4] *Jewish Hosp. v. Reddington*, No. 2019-CA-001306 (Ky. App. Dec. 2, 2019).

[5] *Id.* at *9-10.

[6] *Id.* at *16.

3

The Hospital now appeals the Court of Appeals' denial of its petition. The Hospital asks us to consider, first, whether KRS 311.377(2) applies retroactively to cases pending when the amendment was passed and, then, if it does, whether the RCA is privileged under the statute.

## II. ANALYSIS

### A. Standard of Review

The issuance of a writ of prohibition is "disfavored by our jurisprudence" due to the extraordinary nature of the relief it provides.[7] Thus, this Court employs a "cautious and conservative [approach] both in entertaining petitions for and in granting such relief."[8] We review any factual findings or legal conclusions of the Court of Appeals under the traditional standards (clear error and de novo review respectively).[9] The ultimate decision, however, of whether to issue a writ is discretionary.[10] We therefore review this decision for an abuse of that discretion, considering whether it was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[11]

Prior to considering any issue raised on the merits, we must determine if the case before us belongs to the narrow class of cases to which a writ is

---

[7] *Henderson Cnty. Health Care Corp. v. Wilson*, 612 S.W.3d 811, 817 (Ky. 2020) (quoting *Caldwell v. Chauvin*, 464 S.W.3d 139, 144-45 (Ky. 2015) (internal quotation marks omitted)).

[8] *Id.*

[9] *Appalachian Racing, LLC v. Commonwealth*, 504 S.W.3d 1, 3 (Ky. 2016).

[10] *Id.*

[11] *Id.*

available.[12]  Those cases generally divide into two categories.  The former category concerns cases in which the lower court has acted beyond the scope of its jurisdiction.[13]  The latter category requires the petitioning party to show that the lower court erred and no adequate remedy may be had through appeal.[14]  Ordinarily, the petitioning party need demonstrate that allowing the error to stand will result in irreparable injury.[15]  Yet, in certain special cases—such as the "breaching of a tightly guarded privilege"—a showing of immediate and irreparable harm may be set aside.[16]

Here, the Hospital claims that the trial court's order violates a statutory privilege to which it is entitled.  The Court of Appeals held, and we agree, that the Hospital's petition meets the requirements of the certain special cases exception.  As such, we review the merits of the Hospital's claims.

## B. Retroactivity

At the threshold, we consider whether the amended KRS 311.377 applies to this dispute.  The events giving rise to this litigation occurred in 2016, as did the Hospital's internal review of those events.  The Estate filed suit in 2016 and the Hospital produced the RCA in discovery the following year.  With the exception of trial, nearly every event concerning the creation and disclosure of

---

[12] *See Collins v. Braden*, 384 S.W.3d 154, 158 (Ky. 2012).

[13] *See Wilson*, 612 S.W.3d at 816 (citing *Hoskins v. Maricle*, 150 S.W.3d 1, 10 (Ky. 2004)).

[14] *Id.*

[15] *See Grange Mut. Ins. Co. v. Trude*, 151 S.W.3d 803, 808 (Ky. 2004).

[16] *Id.*

5

the RCA occurred prior to the passage of the 2018 amendment to KRS 311.377. For this reason, the Estate argues that the application of the privilege in this litigation impermissibly grants the statute retroactive effect.

Kentucky law recognizes a strong presumption that statutes operate prospectively.[17] The General Assembly recognized this presumption in KRS 446.080(3), which provides that "[n]o statute shall be construed to be retroactive unless expressly so declared." Thus, "when the General Assembly clearly states legislation is to have retroactive effect or otherwise prescribes its temporal scope or reach, we give effect to the intent of the General Assembly . . . unless to do so would impair some vested right or violate some constitutional guarantee."[18]

KRS 311.377 contains no express statement regarding retroactivity. Nor does the statute clearly express an intent that its provisions be applied retroactively through its temporal scope. Nevertheless, the absence of such express intent does not end our inquiry. Amendments to statutes governing "in-court procedures and remedies which are used in handling pending litigation, even if the litigation results from events which occurred prior to the effective date of the amendment, do not come within the rule prohibiting retroactive application."[19] Accordingly, we examine whether the extension of the privilege set out in KRS 311.377 is procedural or remedial in nature.

---

[17] *Commonwealth Dept. of Agric. v. Vinson*, 30 S.W.3d 162, 168 (Ky. 2000).

[18] *Martin v. Warrior Coal LLC*, 617 S.W.3d 391, 396 (Ky. 2021).

[19] *Vinson*, 30 S.W.3d at 168-69 (citing *Peabody Coal Co. v. Gossett*, 819 S.W.2d 33 (Ky. 1991)).

6

The Estate correctly points out that this Court has previously held that an evidentiary privilege falls on the substantive end of the substance/procedure spectrum.[20] In *Chauvin,* we considered whether the General Assembly's creation of a novel statutory privilege violated the separation of powers provisions of the Kentucky Constitution.[21] Crucially, our analysis focused on the source of the General Assembly's authority to create privilege law. A majority of the Court determined that this authority derived from the legislature's inherent power to enact substantive law, which we defined as "those [laws] that 'predominately foster other objectives' and have an out-of-court effect."[22] We determined that the evidentiary privilege fostered out-of-court objectives (e.g. protecting privacy and combatting drug abuse and addiction) and; consequently, we held that the creation of the privilege was a valid exercise of legislative authority.

In considering retroactivity, however, the focal point of our analysis shifts. Here, we concentrate on the effect of the amendment on the pending litigation.[23] In *Peabody Coal Co. v. Gossett,* we explained the distinction between substantive and procedural laws in the retroactivity context:

> A retrospective law, in a legal sense, is one which takes away or impairs vested rights acquired under existing laws, or which creates a new obligation and imposes a new duty, or attaches a new

---

[20] *Commonwealth Cabinet for Health & Fam. Servs. v. Chauvin,* 316 S.W.3d 279, 284 (Ky. 2010).

[21] *Id.*

[22] *Id. at* 286-87 (quoting Robert G. Lawson, *Modifying the Kentucky Rules of Evidence – A Separation of Powers Issue,* 88 Ky. L.J. 525, 580 (2000)).

[23] *See Vinson,* 30 S.W.3d at 168-169.

7

disability, in respect to transactions or considerations already past. Therefore, despite the existence of some contrary authority, *remedial statutes, or statutes relating to remedies or modes of procedure, which do not create new or take away vested rights, but only operate in furtherance of the remedy or confirmation of such rights, do not normally come within the legal conception of a retrospective law, or the general rule against the operation of statutes.*[24]

*Vinson* illustrates this approach. There, we considered whether amendments to Kentucky's Whistleblower Statute that altered the causation, weight of evidence, and burden of proof elements under the statute were substantive or procedural in nature.[25] The principal effect of the amendment was to make it easier for an aggrieved employee to prove their case and shifted the burden of proof to the employer to rebut certain aspects of the claim.[26] We held that the amendments were substantive because they transformed previously unactionable conduct into conduct which was consequential to the determination of the dispute.[27]

The amendment in KRS 311.377, on the contrary, does not impair the substantive right of the Estate to bring its cause of action. Nor does it bring about a substantive change in the law of medical negligence. The amendment clarifies that the statutory privilege applies in a broader range of cases than this Court had previously held.[28] In the context of this litigation, the statute

---

[24] 819 S.W.2d at 36 (emphasis added).

[25] *Vinson,* 30 S.W.3d at 168-69.

[26] *Id.*

[27] *Id.*

[28] In *Sisters of Charity Health Sys. v. Raikes*, this Court held that "the peer review privilege created by KRS 311.377(2) [was] limited to suits against peer review

8

works to keep otherwise relevant and admissible evidence from the trier of fact. It acts as a rule that predominately affects what happens inside the courtroom (i.e. the manner and means by which a party proves its case). In this sense, the amendment is procedural.[29]

Other jurisdictions have reached similar conclusions. For instance, in *Huntsman v. Aultman Hospital*, the Court of Appeals of Ohio analyzed amendments to Ohio's peer review privilege statute.[30] Ohio courts had interpreted the prior version of the statute to permit the trial court to conduct an in-camera review of a peer review committee's records to determine which documents were privileged.[31] The Ohio legislature amended the statute to clarify that no documents could be obtained from a peer review committee's records; only documents obtainable from their origin source were discoverable.[32] The appellate court held that this amendment was procedural because it only altered the manner in which discoverable material was obtained rather than the substantive components of the underlying claim.[33] Ohio's approach corresponds with numerous jurisdictions in finding amendments to evidentiary privileges to be procedural in nature.[34]

---

entities[.]" 984 S.W.2d 464, 470 (Ky. 1998). The 2018 Amendment to KRS 311.377(2) clearly expands the scope of the statute's applicability.

[29] *See Chauvin*, 316 S.W.3d at 286-87.

[30] 826 N.E.2d 384 (Ohio Ct. App. 2005).

[31] *Id.* at 388.

[32] *Id.*

[33] *Id.*

[34] *State v. Carver*, 258 P.3d 256, 263 (Ariz. Ct. App. 2011) (holding that an amended marital communications privilege governs in proceedings arising before but

After considering our own case law in the context of this trend, we determine that the 2018 amendment to KRS 311.377 is procedural. Being procedural in nature, the statute is exempted from the prohibition against retroactive application. We accordingly conclude that KRS 311.377 applies in this case.

## C. Application of KRS 311.377

The principal issue in this case concerns the scope of the peer review privilege. The resolution of this issue hinges on the interpretation of the term "designated professional review function."[35] The parties agree that only the materials of an entity engaged in such a function qualify for protection under subsection (2) of the statute. But the parties differ as to whether the RCA was produced by a committee engaged in that process.

Statutes creating evidentiary privileges necessitate strict construction because they violate the fundamental principle that "the public . . . has a right to every man's evidence."[36] We accordingly consider broad claims of privilege with careful scrutiny.[37] This critical approach, however, does not force us to

---

tried after its enactment because the amendment was procedural); *People v. Dolph-Hostetter*, 664 N.W.2d 254, 261 (Mich. Ct. App. 2003) (holding that the application of the amended marital communications privilege did not violate the ex post facto clause because it was procedural); *State v. Bragan*, 902 S.W.2d 227, 241 (Tenn. Ct. App. 1995) (amendment to marital communications privilege was procedural); *Ne. Cmty Hosp. v. Gregg*, 815 S.W.2d 320 (Texas App. 1991) (amendment to peer review privilege statute was procedural).

[35] KRS 311.377(2).

[36] *Trammel v. United States*, 445 U.S. 40, 45 (1980) (quoting *United States v. Bryan*, 339 U.S. 323, 331 (1950)).

[37] *Raikes*, 984 S.W.2d at 468-69.

10

abandon our bedrock rules of statutory interpretation. Our goal—if the General Assembly exercised its authority properly—remains to effectuate legislative intent.[38] And when the language of the statute is clear and unambiguous, we must not "add or subtract from the legislative enactment or discover meanings not reasonably ascertainable from the language used."[39]

We begin with the text of the statute. Subsection (1) provides that any person who applies for, or is granted, staff privileges by certain licensed health services organizations, such as a hospital, presumptively waives any claim for damages against the Hospital or its designees for good faith actions undertaken during "the *designated review function* of review of credentials or *retrospective review and evaluation of the competency of professional acts or conduct of other health care personnel.*"[40] Subsection (2), in turn, states that the "proceedings, records, opinions, conclusions, and recommendations" of any entity performing this review function "shall be confidential and privileged and shall not be subject to discovery…in any civil action in any court, including but not limited to medical malpractice actions." The protection of the privilege is limited to "a person or entity that attests to participating in a patient safety and quality improvement initiative." Put simply, the statute renders privileged any documents created by an entity engaged in the retrospective review of the professional conduct of health care providers.

---

[38] *See Abel v. Austin*, 411 S.W.2d 728, 738 (Ky. 2013).

[39] *Commonwealth v. Harrelson*, 14 S.W.3d 541, 546 (Ky. 2000).

[40] (Emphasis added.)

The RCA appears to meet the facial requirements for protection under the statute. Several weeks after Mr. Reddington's death, Melanie Woodring, then-interim risk manager for the Hospital, initiated the RCA process. Woodring testified by deposition that she began her investigation after it became clear that the Estate intended to file a lawsuit against the Hospital. Woodring met with Dr. Jeffrey Goldberg, Chief Medical Officer; Deanna Parker, Director of Nursing; and Robert Wheat, Assistant Nurse Manager. The goal of this group (designated the "Code E team") was to review the cause of Mr. Reddington's death, evaluate the care provided by members of the nursing team, and ascertain whether changes in care needed to be implemented. The RCA contains the ultimate findings and opinions of the team. The document discusses the quality of care Mr. Reddington received and outlines considerations for preventative measures that the Hospital could implement. The document explicitly reviews the professional competency of hospital staff.

The Estate's primary argument to the contrary concerns the impetus for the RCA's creation rather than its contents. Because Woodring only initiated the process after litigation was imminent, the Estate explains, the RCA was created with the primary purpose of internal risk management rather than improving patient safety. Under the Estate's theory, the document's "business purpose" takes it outside of the protection of KRS 311.377(2).

Though KRS 311.377 itself contains no express indication that its coverage is limited to documents created without consideration of litigation, the Estate cites the statute's attestation requirement as evidence of the limitation.

12

Subsection (2) provides that the "confidentiality and privilege protections of this subsection shall only be available to a person or entity that attests to participating in a patient safety and quality improvement initiative, including the program established by the Patient Safety and Quality Improvement Act of 2005[.]" The Estate argues that this language requires the Hospital to demonstrate that the RCA was generated as patient safety work product pursuant to a patient safety and quality improvement initiative.

But this argument elides the fact that the General Assembly clearly did not intend for the privilege provision of KRS 311.377 to be coextensive with federal protections. "Patient Safety Work Product" is a term of art defined by federal statute. The Patient Safety and Quality Improvement Act of 2005 (PSQIA) provides a privilege for patient safety work product conveyed by a covered entity to a patient safety organization.[41] The PSQIA defines patient safety work product as "any data, reports, records, memoranda, analyses, or written or oral statements...assembled or developed by a provider for reporting to a patient safety organization ... and which could result in improved patient safety, health care quality, or health care outcomes[.]"[42]

A textual comparison of the foregoing provision with KRS 311.377 demonstrates that the latter is intended to offer broader protections. First, the attestation provision of KRS 311.377(2) does not require the entity to

---

[41] *See* 42 U.S.C § 299b-22(a); *Univ. of Ky. v. Bunnell*, 532 S.W.3d 658, 665-66 (Ky. App. 2017).

[42] 42 U.S.C § 299b-21(7)(A)(i).

13

participate in the program established by the "PSQIA".  The statute provides that the entity must participate in a patient safety initiative "including" the "PSQIA" program.  The participle "including," in a legal sense, typically demonstrates the presence of a partial or non-exhaustive list.[43]  An entity claiming the privilege, therefore, may but is not required to participate in the patient safety program under the "PSQIA".  This indicates that the General Assembly did not intend to incorporate the peer review provisions of the "PSQIA" wholesale.

Second, the "PSQIA" itself expressly limits the application of its privilege to documents that (1) are reported to a patient safety organization and (2) could result in improved patient safety.[44]  KRS 311.377, on the other hand, privileges the materials of an entity "performing a designated review function," which is defined to include "the retrospective review and evaluation of the competency of professional acts or conduct of other health care personnel."  The latter contains no express requirement of submission to another body.  Nor does it expressly require the court to evaluate whether the document at issue "could" result in better health care outcomes.  The federal privilege had been in force for over a decade as of 2018, the year in which the General Assembly amended KRS 311.377.  Numerous decisions of Kentucky courts had interpreted the scope of the federal privilege, including its application to documents resembling

---

[43] BLACK'S LAW DICTIONARY 777 (8th ed. 2004).

[44] *See* 42 U.S.C § 299b-21(7)(A)(i).

14

the RCA.[45]  The General Assembly was presumably aware of this jurisprudential context when it amended our own peer-review statute.  The absence of equivalent language of limitation in our statute suggests an intent for Kentucky's peer review privilege to offer broader protection than its federal counterpart.

In fact, this broader protection fits within the context of the larger regulatory apparatus applicable to peer review documents.  Under the "PSQIA", both (1) documents mandated to be created and maintained by state regulation or (2) reports voluntarily disclosed are not covered by the federal privilege.[46]  Moreover, under Kentucky case law, a report like the RCA would only be covered if it was "created for the sole purpose of submission to [the hospital's] PSO in accordance with the Act and for no other use whatsoever."[47]  KRS 311.377(2)'s broad language extends coverage to a class of documents generated by peer review committee that would not otherwise be protected under the federal statute.

Here, the Hospital attested to participating in the Kentucky Institute for Patient Safety & Quality (KIPSQ), a federally certified PSO[48].  The report was produced by the "Code E" team assembled by Woodring and set out the findings of a retrospective review of nursing care intended to assess the cause

---

[45] *See e.g., Baptist Health Richmond v. Clouse*, 497 S.W.3d 759 (Ky. 2016); *Tibbs v. Bunnell*, 448 S.W.3d 796 (Ky. 2014); *Bunnell*, 532 S.W.3d 658.

[46] *See Bunnell*, 532 S.W.3d at, 672-73.

[47] *Id*. at 690.

[48] Patient Safety Organization.

of Mr. Reddington's death and improve hospital procedures to increase patient safety.

Both the text of the KRS 311.377 and the statute's place in the broader regulatory context indicate that the General Assembly intended to offer broader protection to peer review documentation than the privilege offered by the "PSQIA". The Estate's proffered business purpose test (which also underlies the Court of Appeals' opinion) relies on case law interpreting a federal statute that expressly provides narrower protection than the state statute. For the foregoing reasons, we hold that the RCA meets the statutory requirements of KRS 311.377 and was privileged.[49]

## III. CONCLUSION

The Hospital successfully demonstrates that it is entitled to a writ of prohibition. Because this case concerns the potential violation of an applicable privilege, the certain special cases exception is met. On the merits, the Hospital demonstrates that the RCA was a report generated during the retrospective review of the professional conduct of its nursing staff. Therefore, we reverse the Court of Appeals' opinion and grant the petition for a writ prohibiting the Circuit Court from enforcing its order permitting the admission of the privileged material for impeachment purposes.

---

[49] The Estate argues that the Hospital waived any claim to privilege protection through its voluntary disclosure of the RCA prior to the passage of amendment to KRS 311.377. The argument fails. Kentucky Rule of Evidence (KRE) 510 states that "A claim of privilege is not defeated by a disclosure which was . . . (2) made without opportunity to claim this privilege." Here, any disclosures occurred prior to the passage of the 2018 amendment so the Hospital lacked the opportunity to assert the privilege.

16

All sitting.  All concur.


COUNSEL FOR JEWISH HOSPITAL, AN ASSUMED NAME OF JEWISH
HOSPITAL & ST. MARY'S HEALTHCARE, INC. & KENTUCKYONE HEALTH,
INC.:

Eleanor M.B. Davis
Bryan Todd Thompson
Joseph Andrew Wright
Louisville, Kentucky


COUNSEL FOR KAREN L. REDDINGTON PARTY IN INTEREST INDIVIDUALLY,
AND AS EXECUTRIX OF THE ESTATE OF DONALD PARTRCK REDDINGTON,
SR.:

Francis T. Conway
John William Conway
Louisville, Kentucky


APPELLEE:

Hon. Mitch Perry, Judge